# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** ) | **Chapter 11** |
| ) | |
| **LINENS HOLDING CO., et al.,**[1] ) | **Case No. 08-10832 (CSS)** |
| ) | |
| **Debtors.** ) | **Jointly Administered** |
| ) | |
| ) | **Bid Procedures Hearing Date (Requested):** |
| ) | **T.B.D.** |
| ) | **Bid Procedures Objection Deadline (Requested):** |
| ) | **T.B.D.** |
| ) | **Sale Objection Deadline (Requested):** |
| ) | **January 13, 2009 at 4:00 p.m.** |
| ) | **Sale Hearing (Requested):** |
| ) | **January 16, 2009 at 10:30 a.m.** |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR ORDERS:
(A) (1) APPROVING BIDDING PROCEDURES WITH RESPECT TO SALE OF
CERTAIN IP ASSETS, (2) APPROVING BID PROTECTIONS WITH RESPECT TO
STALKING HORSE BIDDER, (3) SETTING SALE HEARING DATE AND (4)
APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (B) (1)
APPROVING AND AUTHORIZING SALE OF IP ASSETS TO HIGHEST OR
BEST BIDDER FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS
AND ENCUMBRANCES AND (2) WAIVING THE REQUIREMENTS
OF BANKRUPTCY RULE 6004(H) PURSUANT TO SECTIONS 105, 363,
AND 365 OF THE BANKRUPTCY CODE**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through

their undersigned counsel, pursuant to this motion (the "Motion"), hereby move this Court,

pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedures (the "Bankruptcy Rules"), for the entry of orders (A) (i) establishing bidding

procedures (the "Bidding Procedures") relating to the sale of certain of the Debtors' intellectual

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Linens Holding Co. (2917), Linens 'n Things, Inc. (3939), Linens 'n Things Center, Inc. (0138), Bloomington, MN., L.T., Inc. (8498), Vendor Finance, LLC (5543), LNT, Inc. (4668), LNT Services, Inc. (2093), LNT Leasing II, LLC (4182), LNT West, Inc. (1975), LNT Virginia LLC (9453), LNT Merchandising Company LLC (2616), LNT Leasing III, LLC (3599) and Citadel LNT, LLC (2479).

property assets (the "IP Assets"), including the Debtors' domain names, trademarks and email and mailing lists, (ii) approving certain bid protections to be granted to the Stalking Horse Bidder (as defined herein) and (iii) scheduling a hearing (the "Sale Hearing") to approve any such sales and (iv) approving the form and manner of notice thereof; and (B) (i) following an auction (the "Auction") to be conducted in accordance with the Bidding Procedures, authorizing the sale of the IP Assets to the successful bidder(s) free and clear of all liens, interests, claims and encumbrances and (ii) waiving the 10-day stay contemplated by Bankruptcy Rule 6004(h). In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b).

## GENERAL BACKGROUND

### A. Overview of Debtors

1. As of May 2, 2008 (the "Petition Date"), the Debtors, together with their Canadian subsidiaries[2] (collectively, the "Linens Companies"), comprised North America's second largest specialty retailer of home textiles (including bedding, towels, window treatments and table linens), housewares and home accessories (including cookware, dinnerware, glassware and small appliances). The Linens Companies were one of the largest purchasers of home furnishings in the United States, with a vendor base of approximately 1,000 suppliers. The Debtors provide central office management services to their Canadian subsidiaries in accordance

---

[2] The following are the debtors' Canadian subsidiaries and affiliates, which are not debtors in these chapter 11 cases (collectively, the "Canadian Debtors"): Linens 'n Things Investment Canada I Company, Linens 'n Things Investment Canada II Company, Linens 'n Things Canada Limited Partnership, and Linens 'n Things Canada Corp.

with the Management Agreement.

2.     As of December 31, 2007, the Linens Companies employed approximately 17,500 people and operated 589 retail stores in 47 states in the United States and in 7 Canadian provinces. The Linens Companies' retail stores range in size from 25,000 to 40,000 gross square feet, and were located predominately in power strip centers adjacent to complementary broad-based retail chains in high traffic suburban locations. Through the retail stores, the Linens Companies sold products under their LNT Home private label brand as well as national brands. All of the retail stores were subject to leases with aggregate annual rent in excess of $300 million.

**B.**     **The Debtors' Debt Structure**

3.     The Linens Companies are party to the Credit Agreement, dated as of October 24, 2007, among Linens Inc. and Linens Center, as U.S. borrowers, Linens Canada, as Canadian borrower, Linens Holding, as guarantor, the other Linens Companies, as guarantors, General Electric Capital Corporation ("GECC"), as U.S. Administrative and Collateral Agent, GE Canada Finance Holding Company, as Canadian Administrative and Collateral Agent (together with GECC, in such capacities, the "Prepetition Agents"), the lenders party thereto (collectively, the "Prepetition Lenders") and the other parties thereto under which the Prepetition Lenders provided loans of up to $700 million to the Linens Companies (the "Prepetition Credit Facility"). The Prepetition Credit Facility consisted of a $625 million revolving credit facility and a $75 million Tranche B commitment, both of which were subject to a borrowing base, with $40 million of the revolving credit amount available to Linens Canada, as Canadian borrower.

4.     Amounts outstanding under the Prepetition Credit Facility were secured by (i) a first priority security interest in all of the Linens Companies' inventory, accounts receivable, general intangibles, chattel paper, instruments, letter of credit rights, and certain of

3

the Linens Companies' deposit accounts, securities accounts and capital stock of certain subsidiaries (the "Prepetition Credit Facility Collateral"), and (ii) a second priority security interest in the Linens Companies' equipment, owned real estate, intellectual property, certain deposit accounts, the capital stock of Linens Inc. and the capital stock of certain subsidiaries (limited, in the case of the Canadian Subsidiaries, to 65% of such capital stock) (collectively, the "Indenture Collateral"). As of the Petition Date, an aggregate amount of $369.3 million in borrowings was outstanding under the Prepetition Credit Facility and an aggregate amount of $61.1 million in letters of credit was issued under the Prepetition Credit Facility.

5.     In addition to the Prepetition Credit Facility, Linens Inc. and Linens Center issued $650 million of Senior Secured Floating Rate Notes due 2014 (the "Notes") to noteholders (the "Noteholders") pursuant to an Indenture, dated as of February 14, 2006. The Notes are guaranteed by the Debtors, other than Linens Inc. and Linens Center, and are secured by a first priority security interest in the Indenture Collateral and a second priority security interest in the Prepetition Credit Facility Collateral.

### C.     The First and Second Store Closing Sales

6.     Prior to the Petition Date, the Debtors' identified 120 stores (the "First Round Closing Stores") as underperforming stores that should be closed at the outset of the Debtors' chapter 11 cases in order to aid in the Debtors' reorganization efforts and to ease certain of the liquidity restraints that the Debtors faced, by means of a store closing or similar themed sales (a "Store Closing Sale"). Accordingly, the Debtors filed a motion seeking to, among other things, (i) establish auction procedures for the selection of a national liquidation firm to assist the Debtors with the Store Closing Sales, (ii) authorize the Debtors to close the First Round Closing Stores and (iii) authorize the Debtors to conduct the Store Closing Sales at the First Round Closing Stores in accordance with certain proposed sale procedures. On May 30, 2008, the

4

Court entered an order approving an agency agreement (the "Tiger/SB Capital Agency Agreement") between the Debtors, GECC and a joint venture consisting of Tiger Capital Group, LLC and SB Capital Group, LLC (the "Tiger/SB Capital JV"), authorizing the Tiger/SB Capital JV to serve as the Debtors' agent in connection with this first round of Store Closing Sales and approving certain sale guidelines for the conduct of the Store Closing Sales. Store Closing Sales at the First Round Closing Stores concluded on or before August 31, 2008.

7.     Following a further analysis of their remaining stores, on July 3, 2008, the Debtors filed a motion (the "Second Store Closing Sale Motion") seeking approval of substantially similar procedures with respect to the selection of a liquidation firm to conduct Store Closing Sales at a second set of store locations. Pursuant to the Second Store Closing Sale Motion, on August 14, 2008, the Court entered an order (the "Second Store Closing Order") approving an agency agreement (the "Hilco/Gordon Agency Agreement") between the Debtors and a joint venture of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Hilco/Gordon JV"), authorizing the Hilco/Gordon JV to serve as the Debtors' agent in connection with a second round of Store Closing Sales at 51 of the Debtors store locations (the "Second Round Closing Stores"). The Hilco/Gordon Agency Agreement also contained a "put option" which authorized the Debtors to put additional store locations to the Hilco/Gordon JV to be liquidated in accordance with the terms of the agreement. As discussed below, the Debtors exercised that "put option" in connection with the Third Store Closing Sale Motion (as defined herein).

**D.     The DIP Amendment and the Third Round of Store Closing Sales**

8.     On May 28, 2008, the Court entered its *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral; (II) Granting Liens and Providing Super Priority*

5

*Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling Interim and Final Hearing* [Docket No. 476] (the "Final DIP Order"). Pursuant to the Final DIP Order, the Court authorized the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms of the DIP Agreement. The DIP Facility consists of a senior revolving credit facility (the "Revolver") in a committed amount up to $700 million (with sublimits for letters of credit and swingline loans). Use of the Revolver is limited in accordance with an agreed budget, subject to permitted variances set forth in the DIP Agreement.

9.　In order to avoid being in default under Section 8.1 of the DIP Agreement because of marginally lower than required sales performance, on July 16, 2008, the Debtors filed the *Motion of the Debtors and Debtors in Possession for an Order Approving Amendment to Senior Secured, Super-Priority Debtor in Possession and Exit Option Credit Agreement* [Docket No. 914] (the "DIP Amendment Motion"). Pursuant to the DIP Amendment Motion, the Debtors sought approval of an agreed waiver with respect to specific defaults under the DIP Agreement and those certain terms and conditions of Amendment No. 1 and Waiver to Credit Agreement (the "DIP Amendment"). On July 25, 2008, the Court entered an order (the "DIP Amendment Order") approving the DIP Amendment.

10.　Among other things, the DIP Amendment contained "Budget Compliance Covenants" which required the Debtors, on or before August 1, 2008, to either (i) assume 80% of their remaining retail location real property leases (the "Remaining Leases") or (ii) obtain the written consent from landlords to the Remaining Leases to an extension of the Debtors' time to assume or reject the Remaining Leases through March 31, 2009. With respect to the Remaining Leases for which the Debtors did not receive the required extensions (the "Non-Extended Lease

Locations"), the Debtors were required to commence Store Closing Sales at such locations on or before August 29, 2008.

11.  The Debtors were successful in avoiding an event of default under the DIP Amendment by obtaining the requisite number of written consents from landlords agreeing to extend the Debtors' time to assume or reject the Remaining Store leases by August 1, 2008. Nevertheless, in accordance with their obligations under the DIP Amendment, on August 8, 2008, the Debtors filed a motion (the "Third Store Closing Sale Motion") seeking to exercise the "put option" with respect to 28 of the Non-Extended Lease Locations (the "Third Round Closing Stores") under the terms of the Hilco/Gordon Agency Agreement. On August 29, 2008, the Court entered an order (the "Third Store Closing Order") authoring the Debtors to "put" 11 of the Non-Extended Lease Locations into the store closing sales being conducted pursuant to the Second Store Closing Order.[3]

### E.    The Plan of Reorganization

12.  The DIP Amendment also provided that a default would occur based upon:

> (vi)  the failure of the Debtors to file the Consensual Plan of Reorganization and a disclosure statement relating thereto (each in form and substance satisfactory to the Required Lenders in their sole discretion) with the U.S. Bankruptcy Court, on or prior to August 29, 2008 ...

See DIP Amendment at § 2(d)(vi). In accordance with the requirements of the DIP Amendment, the Debtors assiduously worked to develop a consensual plan of reorganization for these chapter

---

[3] The Debtors similarly filed and successfully prosecuted a fourth store closing motion (the "Fourth Store Closing Motion") whereby the Debtors sought authority to again exercise a "put option" with respect to certain additional Non-Extended Lease Locations (the "Fourth Round Closing Stores") that were inadvertently not included in the relief requested in connection with the Third Store Closing Motion. The Court held a hearing to consider the Fourth Store Closing Motion on September 10, 2008, and entered an order (the "Fourth Store Closing Order") approving it on that same day.

11 cases that would both (i) be satisfactory to GECC and the Debtors various creditor constituencies and (ii) provide for the successful reorganization of the Debtors and their emergence as a going-concern operation.

13. To that end, on August 29, 2008, the Debtors filed (i) *The Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Plan") and (ii) the *Disclosure Statement in Support of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"). Prior to filing the Plan and Disclosure Statement, the Debtors met repeatedly with the Creditors' Committee, GECC and the ad hoc committee of the Debtors' noteholders (the "Ad Hoc Noteholders Committee"), but were unable to reach full agreement on a consensual plan of reorganization. Accordingly, following the filing of the Plan, the Debtors and their advisors continued their discussions with GECC, the Creditors' Committee and the Ad Hoc Noteholders Committee in an effort to obtain support for the Plan. Unfortunately, notwithstanding the expenditure of significant efforts by the Debtors, they were unable to garner the requisite support from the Ad Hoc Noteholders Committee to move forward with the Plan. The DIP Amendment specifically required the Ad Hoc Noteholders Committee's affirmative support in order to move forward with the Plan.[4]

---

[4] The absence of support from the Ad Hoc Noteholders Committee for the Plan raised an issue as to whether the Debtors had fully complied with the requirements of the DIP Amendment (with regards to the filing of a Plan). To address this concern, and avoid an event of default under the DIP Amendment, the Debtors and GECC entered into a separate agreement setting forth a specific timeline for conducting a sale process under section 363 of the Bankruptcy Code (the "Sale Timeline Agreement").

8

**F.**     <u>The Final Round of Store Closing Sales</u>

14.     Without the support for the Plan from the Ad Hoc Noteholders Committee, the Debtors had no choice but to pursue a sale of substantially all of their assets in accordance with the Sale Timeline Agreement. After negotiations withered between the Debtors and all potential going-concern bidders, the Debtors' were forced to pursue the liquidation of their approximately 371 remaining store locations through Store Closing Sales. On October 16, 2008, the Court entered an order authorizing a joint venture of national liquidation firms to serve as the Debtors' agent in connection with a final round of Store Closing Sales at the Debtors' remaining store locations.

**G.**     <u>The Second Amended Plan and Disclosure Statement</u>

15.     On December 15, 2008, the Debtors filed their second amended Plan (the "Second Amended Plan") and second amended Disclosure Statement (the "Second Amended Disclosure Statement"). The Debtors anticipate that a hearing to consider the Second Amended Disclosure Statement will be held on January 16, 2009 and that the confirmation hearing in these chapter 11 cases will be scheduled for February 23, 2009.

<u>**SPECIFIC BACKGROUND**</u>

16.     As discussed above, the Debtors are in the process of conducting a final round of Store Closing Sales at their remaining retail locations. Upon conclusion of the Store Closing Sales, which is scheduled to be no later than January 31, 2009, the Debtors will no longer have any continuing retail operations. Accordingly, the Debtors, with the assistance of their professionals, have been actively marketing the sale of the IP Assets.

17.     As a result of these marketing efforts, on or about December 19, 2008, the Debtors, LNT Acquisition LLC and a joint venture consisting of Hilco Consumer Capital, LLC and Gordon Brothers Brands, LLC (collectively, the "Stalking Horse Bidder" or "Buyer")

entered into an Intellectual Property Purchase Agreement (the "Agreement"), whereby the Stalking Horse Bidder agreed to acquire all of the Debtors' rights, title and interests in and to certain of the IP Assets. A copy of the Agreement is attached hereto as <u>Exhibit A</u>. The pertinent terms of the Agreement are as follows:[5]

a. **Assets to be Purchased.** Subject to the terms and conditions of the Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver or cause to be delivered to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to any intellectual property and intellectual property rights globally, including, without limitation, the following (the "Purchased Assets"):

   (i) all patents, patent applications and patent disclosures, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon;

   (ii) All trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, including, without limitation, the marks and names set forth in Schedule 2.1(b) of the Agreement;

   (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, in each case used primarily in connection with the business of Seller;

   (iv) all software and technology owned by Seller;

   (v) all advertising and marketing materials owned by Seller;

   (vi) inventions, whether patentable or unpatentable and whether or not reduced to practice (to the extent any protectable right exists in any such invention not reduced to practice), and all improvements in existence at the Closing relating to the inventions;

   (vii) trade secrets and confidential business information, including, without limitation, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques,

---

[5] The description of the terms of the Agreement provided herein is intended as a summary only. To the extent the description provided herein differs in any respects from the terms of the Agreement, the terms of the Agreement shall govern. Capitalized terms used in the summary that are not otherwise defined herein have the meanings given to them in the Agreement.

designs, drawings, technical data, databases, customer lists (including postal direct mailing lists and addresses, electronic mailing lists and addresses, bridal and/or gift registry lists, etc.) and contact information, supplier lists, and business and marketing plans and proposals;

(viii)    other proprietary rights and copies and tangible expressions thereof;

(ix)    any and all customer information, including contact information and email addresses and other purchasing history and related information; and

(x)    any claims or causes of action arising out of or related to any infringement, dilution, misappropriation or other violation of any of the foregoing listed in subsections.

b.    **Assumed Liabilities.**  On the Closing Date, Buyer shall assume and agree to discharge all liabilities and obligations of Seller under licenses and agreements included in the Purchased Assets that are not Rejected Licenses (the "Assumed Liabilities").

c.    **Purchase Price.**  On the terms and subject to the conditions set forth in the Agreement, the total consideration (the "Purchase Price") to be paid by Buyer for the Purchased Assets shall be (i) $1,000,000, (ii) twenty-five percent (25%) of the membership interests of Buyer (the "Seller Equity"), (iii) all required cure costs for any Purchased Assets being subject to cure under section 365 of the Bankruptcy Code, and (iii) Buyer's assumption of the Assumed Liabilities.  The Purchase Price shall be payable at Closing as follows:

(i)    Buyer shall deliver $1,000,000 in cash by wire transfer of immediately available funds to an account designated by Seller (the "Cash Payment"); and

(ii)    Buyer shall issue the Seller Equity to Linens Holding Co.

d.    **Bidding Procedures; Break-up Fee.**  Seller shall be entitled to solicit and accept from parties unrelated to Buyer other bids to acquire the Purchased Assets, provided that such bids provide cash to Seller in an amount equal to or greater than $2.5 million (an "Overbid Transaction"). If an Overbid Transaction is approved by the Bankruptcy Court and consummated, the Stalking Horse Bidder shall receive from the proceeds of such transaction a break fee equal to (i) $170,000 plus (ii) actual out-of-pocket fees and expenses, including legal fees, not to exceed $100,000.

11

## RELIEF REQUESTED

18.     By this Motion, the Debtors request the entry of orders, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, (I) (a) approving the Bidding Procedures relating to the sale of the IP Assets, (b) approving certain bid protections to be granted to the Stalking Horse Bidder, (c) scheduling the Sale Hearing and (d) approving the form and manner of notice thereof (the "Sale Procedures Order"); and (II) (a) following the Auction and Sale Hearing, authorizing the sale of the IP Assets to the successful bidder(s) free and clear of all liens, interests, claims and encumbrances and (b) waiving the 10-day stay contemplated by Bankruptcy Rule 6004(h) (the "Sale Order").[6]

## SALE PROCEDURES

### A.     The Bidding Procedures

19.     The Debtors seek approval of the following Bidding Procedures relating to the sale of the IP Assets:

a.     **Due Diligence Requests**.  Upon request, and upon completion of an acceptable confidentiality agreement (if necessary), the Debtors will provide interested bidders with access to various financial data and other relevant information in connection with the IP Assets.  The Debtors will continue to cooperate and provide access to all previously contacted potential bidders who seek to conduct diligence and any other potentially interested bidder (collectively, the "Potential Bidders").

b.     **Joint Venture Between Bidders.**  Prior to forming a joint venture between two or more Potential Bidders, the Potential Bidders must obtain prior written approval from the Debtors; provided however, that such consent (in and of itself) shall not constitute a finding of the Court that the joint venture has acted in "good faith" as such term is used under section 363(m) of the Bankruptcy Code.

c.     **Submission of Qualified Bids.**  On or before **January 14, 2009 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline"), each Potential Bidder must submit a Qualified Bid (as defined below) to the following:  (i) Linens Holding Co., 6 Brighton Road, Clifton, NJ  07012, Attn: Scott Hurd and Dave Coder, Fax: (973)

---

[6] The Debtors intend to file the proposed Sale Order(s) with the court in advance of the Sale Hearing.

836-0309, Email: shurd@lnt.com and dcoder@lnt.com; (ii) Conway Del Genio Gries & Co., LLC, Olympic Tower, 645 Fifth Avenue, New York, NY 10022, Attn: Michael Gries, Fax: (212) 813-0584, Email: mgries@cdgco.com; (iii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins, Fax: (302) 651-7701, Email: collins@rlf.com; (iv) Gardere Wynne Sewell LLP; 1601 Elm Street, Suite 3000, Dallas, TX 7520, Attn: Ron Gaswirth, Esq. and Randy Ray, Esq., Fax: (214) 999-3544, Email: rgaswirth@gardere.com and rray@gardere.com; (v) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY 10169, Attn.: Glenn B. Rice, Esq., Fax: (212) 682-6104, Email: grice@oshr.com; (vi) Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019, Attn: David M. Friedman, Esq., Fax: (212) 506-1700, Email: DFriedman@Kasowitz.com; and (vii) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY, Attn: Mark I. Bane, Esq., Fax: (212) 596-9090, Email: Mark.Bane@RopesGray.com (the "Bid Recipients").

d.    **Unconditional Nature of Bids.**  Bids must be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation or financing.   Neither the Debtors nor any of the other Bid Recipients shall be permitted to share the bids received among the bidders.  All Bids are irrevocable until ten business days after the Sale Hearing.  Bids that meet the foregoing conditions shall be deemed "Bids."

e.    **Form of Agreement.**  A proposed Bid must be based on the terms and conditions of the Agreement.

f.    **Bid Requirements.**    Bids must comply with and contain the information specified in the following paragraphs:

   (i)    Bidders shall send the Bid to the Bid Recipients.

   (ii)    To be considered by the Debtors as a Qualified Bid, such bid must (unless otherwise determined by Debtors):  (a) provide for consideration to the Debtors in an amount equal to or greater than $2.5 million; (b) give sufficient indicia that the Bidder or their representative is legally empowered, by power of attorney or otherwise, to both bid on behalf of the bidder and also to complete and sign, on behalf of the bidder, a binding and enforceable agreement; and (c) provide written evidence of the bidder's ability to consummate the transaction.  The Bid submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid.

   (iii)    The Debtors will, in their discretion, after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee, determine whether an offer is a Qualified Bid and whether a Qualified Bid constitutes the most favorable transaction for the Debtors' estates.  The Debtors may determine, in their business judgment, and after consultation with the Official Committee of Unsecured Creditors (the

"Creditors' Committee"), the Ad Hoc Noteholders Committee and the Indenture Trustee, which Qualified Bids are the highest and best offers for any of the IP Assets. Further, the Debtors may, in their discretion, after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee withdraw some or all of the assets from the Auction at any time before entry of an order approving a sale of the IP Assets to a Qualified Bidder. The Debtors may also, after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee, reject any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) contrary to the best interests of Debtors, their estates and their creditors, or (c) not in conformity with the requirements of the Bidding Procedures or the Bankruptcy Code.

(iv)    The Bid Recipients and each bidder and all other entities shall keep Qualified Bids confidential, with access restricted to the Debtors, the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee. Bids may be revealed to any other entity at the option of the Debtors (provided that Bids may not be shared with other bidders). The Debtors may request additional information from a bidder to evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith, and such bidder shall be obligated to provide such information.

(v)     Each bidder, as a consequence of submitting a Bid for the IP Assets, shall be deemed to acknowledge:    (a) that it is bound by the Bidding Procedures; (b) that it had an opportunity to inspect and examine the IP Assets (or information relating thereto) and to review all pertinent documents and information with respect to IP Assets before making its offer and that each such bidder relied solely on that review and upon its own investigation and inspection in making its Bid; and (c) except as expressly provided for in any agreement, such bidder is not relying upon any written or oral statements, representations or warranties of the Debtors, their agents or representatives.

(vi)    At the commencement of the Auction, the Debtors will announce the best bid received to date and will open the Auction for other Qualified Bidders to improve upon their bid. Bidding increments will be announced at the outset of the Auction.

g.    **The Auction.** The Auction will be conducted on **January 15, 2009 at 10:00 a.m. (Eastern Time)** at the offices of Conway Del Genio Greis & Co., LLC, Olympic Tower, 645 Fifth Avenue, New York, NY, or such other location as may be selected by the Debtors. Only Qualified Bidders who have complied with the Sale Procedures may attend the Auction and improve their Bids at the Auction. The Debtors, the Creditors' Committee, the Ad Hoc Noteholders Committee, and the Indenture Trustee may also attend the Auction. Bidding at the Auction will

14

continue until such time as the highest or otherwise best Bid is determined. The Debtors may adopt rules for the bidding process that, in their judgment, and after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee, and the Indenture Trustee, will better promote the goals of the bidding process and that are not inconsistent with any of the provisions of the Sale Procedures Order. The Debtors will select the highest or otherwise best Bid(s) at the conclusion of the Auction, after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee, subject to Court approval, and the winning bidder(s) will be required to enter into a definitive sale agreement (as consensually modified by the parties, if appropriate) before the Auction is deemed closed.

h. **The Sale Hearing.** The Debtors request that the Sale Hearing be held on **January 16, 2009 at 10:30 a.m. (Eastern Time)**. The Sale Hearing may be adjourned without further notice other than by announcement at the Sale Hearing. The Debtors have also requested that the Court establish **January 13, 2009 at 4:00 p.m. (Eastern Time)** as the deadline for filing objections to the Motion and any proposed Sale Order.

i. **Reservation of Rights.** The Debtors reserve the right to (i) adjourn the Auction with respect to some or all of the Debtors' assets at or prior to the Auction, (ii) modify the Bidding Procedures at the hearing to approve the Sale Procedures Order or the Auction and/or (iii) remove any assets from the auction process if the Debtors, after consultation with the Creditors' Committee, the Ad Hoc Noteholders Committee and the Indenture Trustee, determine that such action will maximize value to their estates.

**ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED A QUALIFIED BIDDER.**

20. The Debtors believe that these Bidding Procedures provide an appropriate process for selecting and soliciting bids from interested bidders and will enable the Debtors to review and compare any Bids received and determine which Bid(s) is the highest or best Bid.

**B.    Approval of Bid Protections**

21. As set forth above, the Agreement provides for certain bid protections to be granted to the Stalking Horse Bidder. Specifically, in the event that an "Overbid Transaction" is approved and consummated, the Stalking Horse Bidder shall receive a break-up fee of $170,000, plus out-of-pocket fees and expenses, including legal fees, not to exceed $100,000. Bidding protections, such as a break-up fee or expense reimbursement, encourage a potential

purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Associates L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted). A proposed bidding incentive, such as the break-up fee or expense reimbursement, should be approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104; see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

22. Approving bidding protections will commit the Stalking Horse Bidder to a bid that starts any additional bidding for the assets at a fair and reasonable purchase price, all to the benefit of the Debtors' estates. Indeed, the Debtors believe that providing certain bidding incentives will encourage bidding by serving any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders

to follow; or (3) to attract additional bidders. In other words, if the assets are sold to a competing

bidder, it will – in all likelihood – be because of a Stalking Horse Bidder's crucial role.

**C.     Approval of Sale of the IP Assets Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims and Encumbrances Is Warranted.**

23.     Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other
> than in the ordinary course of business, property of the estate ....

11 U.S.C. § 363(b)(1); see also In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr.

S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by section 363(b)).

24.     To obtain Court approval to sell the IP Assets under section 363(b) of the

Bankruptcy Code, the Debtors must articulate a business reason for the proposed action. See,

e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v.

Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Comm. of Equity Sec. Holders v.

Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies,

Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment"

test of Lionel Corp. and requiring good faith); In re Delaware & Hudson Ry. Co., 124 B.R. 169,

175-76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment"

test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v. Montgomery Ward Holding

Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999)

(same).  When a valid business justification exists, the law vests the debtor's decision to sell its

property with a strong presumption "that in making a business decision[,] the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding

17

that the Delaware business judgment rule has "vitality by analogy" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted). In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the potential bidders with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. In re Delaware and Hudson Ry. Co., 124 B.R. at 176; accord In re Decora Indus., Inc., 2002 WL 32332749 at *3 (D. Del. 2002); see also In re Integrated Res., Inc., 147 B.R. at 656 (parties challenging a debtor's sound business decision must show bad faith, self-interest or gross negligence).

25.     Ample business justification exists in these cases to approve the sale of the IP Assets. As this Court is fully aware, the Debtors are in the process of conducting Store Closing Sales at each of their remaining locations and liquidating their remaining assets. Upon conclusion of the Store Closing Sales, the Debtors will have no continuing business operations, and therefore no need for the IP Assets. Accordingly, the Debtors submit that it is in the best interests of their estates to conduct an orderly and efficient sale process with respect to the IP Assets in an effort to maximize value.

26.     The Debtors likewise request that any sale of the IP Assets be free and clear of any and all liens, interests, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

18

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met). The Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code with respect to any party asserting a lien, interest, claim or encumbrance in the IP Assets. Specifically, the Debtors propose that any liens, interests, claims, and encumbrances asserted against the IP Assets be transferred to any proceeds realized from the sale of such assets, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto.

## D. The Purchaser(s) of the IP Assets Should Be Afforded the Full Protections of Section 363(m) of the Bankruptcy Code.

27.     The Debtors also request that the Court find that the purchaser(s) of the IP Assets is entitled to the full protections of section 363(m) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal

11 U.S.C. § 363(m). While the Bankruptcy Code does not define the term "good faith," the Third Circuit in Abbotts Dairies stated that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

28.     The Agreement is the result of good faith arms'-length negotiations between the Debtors and the Stalking Horse Bidder. The Debtors likewise anticipate that they will be able to demonstrate that any proposed transaction with an alternative bidder is the result of good faith arms'-length negotiations. Accordingly, the Debtors submit that the purchaser(s) of any of the IP Assets should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## E.     The Debtors Should Be Authorized to Assume and Assign Any Licenses or Executory Contracts Relating to the IP Assets to the Purchaser(s) in Accordance with Section 365 of the Bankruptcy Code.

29.     In connection with the sale of the IP Assets, the Debtors anticipate that the purchaser shall have the right to require the Debtors to assume and assign, or, alternatively, reject any licenses or executory contracts relating to the IP Assets, as identified in the Agreement (the "Contracts").

30.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume or reject, subject to the court's approval, executory contracts or unexpired leases of the debtor. 11 U.S.C. § 365(a) and (b); In re Taylor, 913 F.2d 102, 106 (3d Cir. 1990). Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Accordingly, the Debtors seek the authority, but not direction, to assume and assign, or, alternatively, reject the Contracts as part of any transaction for the IP Assets.

20

## REQUEST FOR WAIVER OF STAY

31.     The Debtors seek a waiver of any stay of the effectiveness of any Sale Order entered in connection with this Motion.  Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The IP Assets include patents, trademarks, copyrights, software, customer lists and other assets that decline in value over time.  Accordingly, the Debtors submit that it is imperative that they be able to close any transaction for the IP Assets as quickly as possible in order to maximize the value received for the assets.  Thus, the Debtors submit that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rules 6004(h).

## NOTICE

32.     Notice of this Motion has been provided to (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) counsel to the Ad Hoc Trade Committee; (iv) the Stalking Horse Bidder; (v) all parties known to be asserting a lien in the IP Assets; (vi) all Potential Bidders; and (vii) all entities having filed a request for the notice pursuant to Bankruptcy Rule 2002 in these chapter 11 cases.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

RLF1-3339195-3

WHEREFORE, the Debtors respectfully request the entry of (i) the Sale Procedures Order, in substantially the form attached hereto as <u>Exhibit B</u>, and (ii) following the Sale Hearing, the Sale Order(s), granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: December 22, 2008
      Wilmington, Delaware

Respectfully submitted,

_Katherine Good_

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Jason M. Madron (No. 4431)
L. Katherine Good (No. 5101)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for the Debtors and Debtors in Possession*

RLF1-3339195-3