EXHIBIT A

## INTELLECTUAL PROPERTY PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY PURCHASE AGREEMENT (*"Agreement"*) is entered into effective as of December 22, 2008 by and among Linens Holding Co., a Delaware corporation, and its affiliated debtors and debtors-in-possession (collectively, *"Seller"*), LNT Acquisition, LLC, a Delaware limited liability company (*"Buyer"*), and a joint venture (the *"Joint Venture"*) comprised of Hilco Consumer Capital, L.P., a Delaware limited partnership (*"Hilco"*), and Gordon Brothers Brands, LLC, a Delaware limited liability company (*"Gordon Brothers"*). Buyer and the Joint Venture are referred to herein collectively as *"Buyer Parties."* Buyer, Seller and the Joint Venture are also referred to herein individually as a *"Party"* and collectively as the *"Parties."*

### RECITALS:

WHEREAS, Seller owns certain trademarks, copyrights, trademark applications, copyright applications, patent rights and other intellectual property;

WHEREAS, subject to the terms and conditions set forth herein, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title and interest in and to such intellectual property;

WHEREAS, on May 2, 2008, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*);

WHEREAS, on December 22, 2008, Seller filed with the Bankruptcy Court a Motion for Orders Pursuant to 11 U.S.C. §§ 105, 363, and 365 of the Bankruptcy Code and Rules 2002 and 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), for the entry of orders: (a)(1) Approving Bidding Procedures With Respect to Sale of Certain IP Assets, (2) Approving Bid Protections With Respect to Stalking Horse Bidder, (3) Setting Sale Hearing Date and (4) Approving Form and Manner of Notice Thereof; and (b)(1) Approving and Authorizing Sale of IP Assets to Highest or Best Bidder Free and Clear of All Liens, Interests, Claims and Encumbrances and (2) Waiving the Requirements of Bankruptcy Rule 6004(H) (the *"Sale Motion"*); and

WHEREAS, the Parties desire that this Agreement shall serve as the "stalking horse bid" for the purpose of a sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code.

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

For the purposes of this Agreement, the following terms shall have the meanings specified or referred to below when used in this Agreement.

"*Approval Order*" has the meaning set forth in Section 6.7.

"*Assumed Liabilities*" has the meaning set forth in Section 2.4.

"*Bankruptcy Code*" has the meaning set forth in the Recitals to this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the Recitals to this Agreement.

"*Bankruptcy Rules*" has the meaning set forth in the Recitals to this Agreement.

"*Bid Procedures*" has the meaning set forth in Section 5.1(d).

"*Business*" means the business of Seller, including, without limitation, the sale of retail products through retail stores, via catalog, and over the internet.

"*Buyer Interest*" has the meaning set forth in Section 4.3.

"*Canadian Agreements*" means (i) the License Agreement dated January 2, 2005 between LNT Merchandising Company, LLC and LNT West, Inc., and (ii) the Amended and Restated Royalty Agreement dated as of April 30, 2008, between LNT West, Inc. and Linens 'n Things Canada Corp. (the "*Royalty Agreement*").

"*Cash Payment*" has the meaning set forth in Section 2.3(a).

"*Closing*" has the meaning set forth in Section 2.6.

"*Closing Date*" has the meaning set forth in Section 2.6.

"*Excluded Assets*" has the meaning set forth in Section 2.2.

"*GOB Agent*" has the meaning set forth in Section 6.1(a).

"*GOB Order*" has the meaning set forth in Section 6.1(a).

"*Governmental Body*" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"*GSI Agent*" has the meaning set forth in Section 6.1(a).

2

*"Harte-Hanks"* means Harte-Hanks Data Technologies, Inc., any successors or assigns and any affiliates thereof.

*"Harte-Hanks Agreement"* means that certain Master License and Services Agreement by and between Harte-Hanks Data Technologies, Inc. and LNT, Inc., dated October 10, 2003, as amended, modified or supplemented thereafter, together with all Schedules issued thereunder.

*"Operating Agreement"* has the meaning set forth in Section 5.1(b).

*"Order"* means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

*"Overbid Transaction"* has the meaning set forth in Section 6.8.

*"Permits"* means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

*"Person"* means an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a division or operating group of any of the foregoing, a government or any department or agency thereof or any other governmental body.

*"Purchase Price"* has the meaning set forth in Section 2.3.

*"Purchased Assets"* has the meaning set forth in Section 2.1.

*"Rejected Licenses"* has the meaning set forth in Section 2.2.

*"Sale Motion"* has the meaning set forth in the Recitals to this Agreement.

*"Seller Documents"* has the meaning set forth in Section 3.1.

*"Seller Equity"* has the meaning set forth in Section 2.3.

*"Seller's knowledge,"* the *"knowledge of Seller,"* *"Seller has no knowledge"* and any similar expression refer to the actual, conscious knowledge of F. David Coder, Scott M. Hurd, Kathy Kimple and Dan McCart.

## ARTICLE II

## PURCHASE AND SALE OF INTELLECTUAL PROPERTY

Section 2.1     Assets to be Purchased.     Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver or cause to be delivered to Buyer (or a wholly owned subsidiary of Buyer designated by Buyer and approved in writing by Seller) and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to any intellectual property and intellectual property rights globally, including, without limitation, the following (the *"Purchased Assets"*):

(a)     all patents, patent applications and patent disclosures, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon set forth in Schedule 2.1(a) attached hereto;

(b)     All trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with (i) any of the foregoing and (ii) that portion of the Seller's ongoing and existing business to which the trademarks pertain, and all applications, registrations and renewals thereof, including, without limitation, the trademarks and trade names set forth in Schedule 2.1(a) attached hereto;

(c)     copyrights and registrations and applications therefor and works of authorship, and mask work rights, in each case used primarily in connection with the business of Seller set forth in Schedule 2.1(a) attached hereto;

(d)     all software and technology owned by Seller;

(e)     all advertising and marketing materials owned by Seller;

(f)     inventions, whether patentable or unpatentable and whether or not reduced to practice (to the extent any protectable right exists in any such invention not reduced to practice), and all improvements in existence at the Closing relating to the inventions;

(g)     trade secrets and confidential business information, including, without limitation, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, designs, drawings, technical data, databases, customer lists (including postal direct mailing lists and addresses, electronic mailing lists and addresses, bridal and/or gift registry lists, etc.) and contact information, supplier lists, and business and marketing plans and proposals;

(h)     other proprietary rights and copies and tangible expressions thereof;

(i)     any and all customer information, including contact information and email addresses and other purchasing history and related information;

(j)     the licenses and executory agreements set forth in Schedule 2.1(j), such Schedule to be agreed upon by the Parties prior to Closing (but excluding the Rejected Licenses); and

(k)     any claims or causes of action arising out of or related to any infringement, dilution, misappropriation or other violation of any of the foregoing listed in subsections (a) – (j).

Section 2.2     Excluded Assets. The assets to be conveyed hereby are restricted solely to the Purchased Assets, and any other assets of Seller or any of its affiliates (whether tangible or intangible) not expressly set forth in Section 2.1 above are expressly excluded therefrom,

4

including, without limitation, the following (the "*Excluded Assets*"): (i) the rights and obligations of Seller under the Canadian Agreements, (ii) licenses or executory agreements that would otherwise be included in the Purchased Assets, but for the fact that Buyer directs Seller to reject such agreements in connection with Seller's proceedings in the Bankruptcy Court ("*Rejected Licenses*"), (iii) E-Commerce Agreement, dated as of March 18, 2003, between GSI Commerce Solutions, Inc. and LNT, Inc., (iv) any limited, non-exclusive license of intellectual property by Seller under agreements with third-party suppliers, liquidators or other third parties as part of dispute settlements, as set forth in Schedule 2.2 attached hereto, (v) any and all software licensed by Seller from third parties, (vi) any license or agreement that Seller is not permitted to assign to and be assumed by Buyer as a result of Seller's proceedings in the Bankruptcy Court, unless the consent of the other party to such license or agreement to such assignment and assumption shall have been obtained by Buyer, (vii) domain name registrations for www.linennthings.com (owned by Lead Networks Domains Pvt. Ltd.), www.linensthings.com (owned by Richard Gilbert), and www.linenthings.com, and (viii) the Harte-Hanks Agreement.

Section 2.3    Purchase Price. On the terms and subject to the conditions set forth in this Agreement, the total consideration (the "*Purchase Price*") to be paid by Buyer for the Purchased Assets shall be (i) $1,000,000, (ii) twenty-five percent (25%) of the membership interests of Buyer (the "*Seller Equity*"), (iii) all required cure costs for any Purchased Assets being subject to cure under Section 365 of the Bankruptcy Code, and (iv) Buyer's assumption of the Assumed Liabilities. The Purchase Price shall be payable at Closing as follows:

(a)    Buyer shall deliver $1,000,000 in cash by wire transfer of immediately available funds to an account designated by Seller (the "*Cash Payment*"); and

(b)    Buyer shall issue the Seller Equity to Linens Holding Co.

Section 2.4    Assumed Liabilities. On the Closing Date, Buyer shall assume and agree to discharge all liabilities and obligations of Seller under licenses and agreements included in the Purchased Assets (the "*Assumed Liabilities*").

Section 2.5    Excluded Liabilities. All liabilities are excluded unless specifically set out in Section 2.4 above.

Section 2.6    Closing. The closing of the transactions contemplated by this Agreement (the "*Closing*") shall occur on the date (the "*Closing Date*") set forth in the order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby. The Closing shall take place at the offices of Conway, Del Genio, Gries & Co., LLC, 645 Fifth Avenue, New York, New York, 10022, or at such other time and place designated by Seller. The Parties need not attend the Closing in person, and the delivery of all documents and funds as described in Sections 2.7 and 2.8 may be handled by wire transfer and electronic mail or by facsimile transmission. Seller and Buyer shall use their respective commercially reasonable efforts to cause the Closing Date to occur no later than January 19, 2009.

5

Section 2.7    Seller's Deliveries On Closing Date. Seller shall deliver the following to Buyer on the Closing Date:

(a)    the Approval Order;

(b)    instruments of assignment of the United States and foreign letters patent, patents, patent applications, trademarks, service marks, trademark and service mark registrations and applications, copyrights and copyright registrations and applications included in the Purchased Assets, in each case duly executed and acknowledged by the applicable Seller entity, including, without limitation, the following:

(i)    the Assignment of Trademarks, executed by Seller, as assignor, for the benefit of Buyer, as assignee, in the form attached hereto as Exhibit A; and

(ii)    the Assignment of Trade Mark Rights – More than One Mark, executed by Seller, as assignor, for the benefit of Buyer, as assignee, in the form attached hereto as Exhibit B;

(iii)    the Copyright Assignment, executed by Seller, as assignor, for the benefit of Buyer, as assignee, in the form attached hereto as Exhibit C;

(iv)    the Assignment of the "Super Set Beach Set Cooler" design invention executed by Seller and Theresa Ulczak, as assignors, for the benefit of Buyer, as assignee, in the form attached hereto as Exhibit D;

(v)    Applications for Assignment of Trademark Application/ Registration executed by Seller, as assignor, for the benefit of Buyer, as assignee, to be filed with the People's Republic of China, in substantially the forms attached hereto as Exhibit E;

(vi)    the Power of Attorney executed by Seller, as assignor, in the form attached hereto as Exhibit F; and

(c)    all other documents and agreements necessary to consummate the transaction described herein that Buyer may reasonably request.

Section 2.8    Buyer's Deliveries Upon Closing. Buyer shall deliver to Seller at Closing:

(a)    Cash Payment;

(b)    the Power of Attorney executed by Buyer, as assignee, in the form attached hereto as Exhibit G;

6

(c) by wire transfer of immediately available funds to an account designated by Seller, cash in an amount equal to the amount of the Harte-Hanks Payments in accordance with Section 6.9; and

(d) all other documents and agreements necessary to consummate the transactions described herein that Seller may reasonably request.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the following are true and correct as of the date hereof and the date of the Closing:

Section 3.1 Authority, Validity and Binding Effect. Except for such authorization as is required by the Bankruptcy Court, Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "*Seller Documents*"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Approval Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 3.2 Conflicts; Consents of Third Parties.

(a) To Seller's knowledge, none of the execution and delivery by Seller of this Agreement or by Seller of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller; (ii) subject to entry of the Approval Order, any contract or permit to which Seller is a party or by which any of the properties or assets of Seller are bound; (iii) subject to entry of the Approval Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of

7

Seller as of the date hereof, or (iv) subject to entry of the Approval Order, any applicable Law, other than, in the case of clauses (ii) and (iii), such conflicts, violations, defaults, terminations or cancellations that would not have (x) a material adverse effect on the business, assets, properties, results of operations or financial condition of Seller, or (y) a material adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement.

(b)    To Seller's knowledge, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Approval Order, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have (x) a material adverse effect the business, assets, properties, results of operations or financial condition of Seller, or (y) a material adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement.

Section 3.3    Assets Sold Free and Clear.  Upon the execution and delivery by Seller of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby or thereby, following Bankruptcy Court approval thereof, Buyer will receive all of Seller's right, title and interest to the Purchased Assets free and clear of any and all liens, claims or interests, or liabilities, pursuant to Sections 363 and 365 of the Bankruptcy Code.

Section 3.4    Claims.  Seller represents and warrants that, except as set forth in Schedule 3.4: (i) Seller has no knowledge of any third party infringing or otherwise violating any of the Purchased Assets; (ii) Seller has no knowledge of any intellectual property infringement claims, lawsuits, or demands arising under or in connection with the Purchased Assets; (iii) no proceeding or claims that are currently pending have been asserted by Seller alleging that any person or entity is infringing or otherwise violating any of the Purchased Assets; (iv) to the knowledge of Seller, there has been no unauthorized use or disclosure or any material trade secret of Seller by any current or former employee, licensee, distributor or consultant of Seller or by any other third party; and (v) no claims are pending or, to the knowledge of Seller, threatened, against Seller based on any claim or allegation that any of the Purchased Assets infringe, misappropriate, dilute, or otherwise violate any intellectual property, privacy or publicity right of any third party.

Section 3.5    AS IS, WHERE IS.  EXCEPT AS OTHERWISE SET FORTH IN ARTICLE 3, THE PURCHASED ASSETS ARE BEING SOLD, CONVEYED, TRANSFERRED, ASSIGNED AND DELIVERED TO BUYER IN AN "AS IS" AND "WHERE IS" CONDITION, AND SELLER EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND

8

FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO IMPLIED REPRESENTATIONS, WARRANTIES OR COVENANTS OF SELLER IN THIS AGREEMENT OR IN ANY DOCUMENT OR AGREEMENT EXECUTED BY SELLER PURSUANT HERETO. CERTAIN OF THE PURCHASED ASSETS (INCLUDING ASSETS CONSISTING OF OR INCLUDING SOFTWARE) MAY BE BUNDLED OR COMBINED WITH, OR DERIVATIVE WORKS OF, MATERIALS OWNED BY THIRD PARTIES SUCH THAT SUCH PURCHASED ASSETS HAVE NO USE OR PRACTICAL EFFECT SEPARATE AND APART FROM SUCH THIRD-PARTY MATERIALS AND THE VIABILITY OF SUCH PURCHASED ASSETS ARE DEPENDENT UPON SUCH THIRD-PARTY MATERIALS AND ANY UNDERLYING LICENSES GRANTED BY THE OWNERS AND/OR LICENSORS OF SUCH THIRD-PARTY MATERIALS (NONE OF WHICH HAS AN IMPACT ON THE OPERATION OF ANY INTERNET WEBSITES OR TO THE OPERATION OF INTERNET SALES).

Section 3.6. None of the Purchased Assets are held, owned or controlled by the indirect Canadian subsidiaries of Linens Holding Co.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF BUYER PARTIES

Each of Buyer Parties, jointly and severally, represents and warrants to Seller that the following are true and correct:

Section 4.1 Authority, Validity and Binding Effect. Each Buyer Party has all necessary corporate, limited liability company, or other appropriate power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Agreement on its behalf to so execute. This Agreement has been duly and validly executed and delivered by each Buyer Party and is enforceable against each such Buyer Party in accordance with its terms. At Closing, the Operating Agreement shall represent the sole governing document or agreement among Buyer and its members other than the Certificate of Formation of Buyer filed with the Secretary of State of the State of Delaware on December 18, 2008.

Section 4.2 No Defaults. To the knowledge of each of the Buyer Parties, the execution and delivery of this Agreement and any documents contemplated hereby by each Buyer Party and the performance of their respective obligations hereunder and thereunder does not and will not:

(a) Conflict with or result in any material breach of the provisions of, or constitute a default under any governing or organizational document of any Buyer Party.

(b) Violate any material restriction to which any Buyer Party is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization, or

permit or other material agreement or instrument to which any Buyer Party is a party, or result in the termination of any such instrument or termination of any provisions in such instruments that will result in the impairment of any Buyer Party's rights under such instruments; and

(c) Constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or Governmental Body, or of any judgment, decree, writ, injunction or Order to which any Buyer Party is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which any Buyer Party or any of its affiliates is a party.

Section 4.3  Capitalization of Buyer and Joint Venture.  As of the date hereof and immediately preceding the Closing, all of the equity interests in the Joint Venture are owned of record and beneficially by Hilco and Gordon Brothers and all of the membership and equity interests of Buyer (the "*Buyer Interest*") are owned of record and beneficially by the Joint Venture. All Buyer Interest (including the Seller Equity) has been or at Closing will be duly and validly issued and fully paid and nonassessable. The Buyer Interest issued and outstanding as of the date hereof has been, and the Seller Equity shall be, issued in compliance with all applicable legal requirements, including, without limitation, securities laws. The Seller Equity shall be free of all encumbrances and restrictions whatsoever other than those imposed by the Operating Agreement. Except for the Buyer Interest owned by the Joint Venture and the Seller Equity, there are not, and on the Closing Date there will not be, outstanding (i) any other equity interests of Buyer, (ii) any options, warrants or other rights to purchase from Buyer any equity interests of Buyer; (iii) any securities convertible into or exchangeable for equity interests of Buyer; or (iv) any other commitments of any kind for the issuance of equity interests or options, warrants or other securities of Buyer.  Buyer has no obligation or right (contingent or otherwise) to purchase, redeem or otherwise acquire any of its equity securities or any interests therein or to pay any dividend or make any distribution in respect thereof other than as set forth in the Operating Agreement. Except as set forth in the Operating Agreement, Buyer has no option plans, profits interest plans, equity purchase plans, phantom unit plans, appreciation rights plans or similar plans or agreements to issue equity or rights thereto to any Person or otherwise share profits or revenues of Buyer with any Person who is not a member of Buyer. Except as set forth in the Operating Agreement, there are no preemptive rights, voting trusts, proxies or other agreements or understandings to which Buyer is a party or is bound with respect to the voting, sale or transfer of any equity of Buyer.

Section 4.4  Activities of Buyer.  Buyer has not conducted any activities or incurred any liabilities other than in connection with its organization, the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby and the negotiation and execution of documents related to the consummation of the transactions contemplated hereby.

Section 4.5  No Litigation.  There are no actions, suits, claims, governmental investigations or other legal or administrative proceedings, or any orders, decrees or judgments in progress, pending or in effect, or, to Buyer's knowledge, threatened against, any Buyer Party relating to the transactions contemplated by this Agreement.

10

Section 4.6    Financial Capacity.    Buyer Parties have the financial capacity to consummate the transactions contemplated herein, including, without limitation, to fund the working capital requirements of Buyer following the Closing in accordance with the Operating Agreement.

Section 4.7    Sufficient Opportunity to Investigate.    Each Buyer Party acknowledges, represents and warrants that it has had sufficient opportunity to make whatever investigation may be necessary and advisable for purposes of determining whether or not to enter into this Agreement.

Section 4.8    Due Diligence.    Each Buyer Party hereby acknowledges and agrees that each Buyer Party has conducted its own due-diligence investigation of the Purchased Assets and that Buyer will acquire the Purchased Assets, except as set forth in Article 3, "AS IS, WHERE AS." None of Buyer Parties will have any personal recourse to any of the owners of Linens Holding Co. or affiliates, directors, managers, officers, attorneys or advisors of Seller if any representation or warranty made herein, or deemed made herein, is inaccurate in any respect, except to the extent of any insurance coverage available to such parties. Each Buyer Party specifically acknowledges and agrees that, if any information provided in the Sale Motion is applicable to any Section of this Agreement, then such information shall be deemed to have been timely provided to Buyer with respect to all Sections of the Agreement.

Section 4.9    Finder's Fee.    None of Buyer Parties has paid or become obligated to pay any fee or commission to any broker, finder, consultant or intermediary for or on account of the transactions contemplated by this Agreement. None of Buyer Parties has engaged, consented to or authorized any broker, investment banker or third party to act on its behalf directly as broker or finder in connection with the purchase contemplated by this Agreement.

## ARTICLE V

## CONDITIONS

Section 5.1    Conditions to Seller's Obligation to Close.    Seller's obligation to sell the Purchased Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions:

(a)    Each of the representations and warranties of Buyer Parties in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made.

(b)    Buyer shall have delivered to Seller the Operating Agreement of LNT Acquisition, LLC, in form and substance satisfactory to Seller, executed by the Joint Venture as a member of Buyer (the "*Operating Agreement*").

(c)    The Closing shall occur no later than January 19, 2009.

11

(d)     The Bankruptcy Court's entry of the Approval Order (or an order in form and effect substantially similar thereto), and all other orders, approvals and consents from the Bankruptcy Court required to transfer the Purchased Assets in a form and substance satisfactory to Seller on or before January 19, 2009.

(e)     Seller shall have been reimbursed by Buyer at Closing in full for the Harte-Hanks Payments in accordance with Section 6.9.

(d)     The entry of order or orders of the Bankruptcy Court approving the bid procedures and the bid protections to Buyer as "Stalking Horse" as set forth in Section 6.8 hereof (collectively, the "*Bid Procedures*"), in a form and substance satisfactory to Seller on or before January 15, 2009.

Section 5.2     Conditions to Buyer's Obligation to Close.  Buyer's obligation to purchase the Purchased Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions:

(a)     Each of the representations and warranties of Seller in this Agreement shall have been accurate in all material respects and not misleading, as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made.

(b)     The Closing shall occur no later than January 19, 2009.

(c)     The Bankruptcy Court's entry of the Approval Order (or an order in form and effect substantially similar thereto), and all other orders, approvals and consents from the Bankruptcy Court required to transfer the Purchased Assets in a form and substance satisfactory to the Buyer Parties on or before January 19, 2009.

(d)     The entry of order or orders of the Bankruptcy Court approving Bid Procedures (including the break fee and other bid protections to Buyer as "Stalking Horse" set forth in Section 6.8) in a form and substance satisfactory to the Buyer Parties on or before January 15, 2009.

## ARTICLE VI

## COVENANTS

Section 6.1     Royalty-Free License.

(a)     For the sole purpose of conducting (i) the Sale (as that term is defined in the Bankruptcy Court's Order dated October 16, 2008 approving the Agency Agreement made as of October 16, 2008, by and between a joint venture comprised of Gordon Brother Retail Partners, LLC, Hilco Merchant Resources, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC, Hudson Capital Partners, LLC and Great American Group, LLC (collectively, the "*GOB Agent*") and Seller) (the "*GOB Order*") and (ii) sales related to Internet Merchandise (as that term is defined in the Bankruptcy Court's Order

12

dated October 17, 2008 approving the Agency Letter Agreement made as of October 17, 2008, by and between GSI Commerce Solutions, Inc., Hilco (collectively, the "*GSI Agent*") and Seller, Buyer hereby grants an irrevocable, non-exclusive, royalty-free, worldwide right and license to use, possess, copy, modify, display, perform, sublicense, disclose and exploit the Purchased Assets to (a) the GOB Agent, (b) the GSI Agent and (c) Seller. Buyer specifically consents to the use of the Purchased Assets in connection with the Sale (as defined in the GOB Order) and the Internet Merchandise sales without any additional cost to the GOB Agent, the GSI Agent or Seller.

(b)     For the sole purpose of operating Seller's internal, financial, accounting and inventory systems until the liquidation of Seller's assets is complete, Buyer hereby grants to Seller an irrevocable, non-exclusive, royalty-free worldwide right and license to use and possess all software and technology related to accounting and inventory systems (excluding any software and technology relating to any internet website or the operation of internet sales) included in the Purchased Assets.

Section 6.2     Canada Royalties. Buyer and the Joint Venture acknowledge and agree that until the termination of the Sale (as defined in the GOB Order), Seller is entitled to continue to collect royalties under the Royalty Agreement.

Section 6.3     Cure Costs. Buyer shall have the sole right to require Seller to assume and assign, or, alternatively, reject any licenses or executory agreements included in the Purchased Assets by notifying Seller in writing within three business days prior to the Closing of which such licenses and executory agreements Buyer requires Seller to assume, assign or reject. Buyer shall be obligated to promptly pay all amounts required to "cure" defaults pursuant to Section 365 of the Bankruptcy Code with respect to licenses and agreements that are assumed and assigned to the Buyer provided that the Debtors file a schedule listing the cure amounts for each licenses and agreement and causing the Court to schedule a deadline to object to the cure amounts at or before the time of the auction for the sale of the of the Purchased Assets. As part of the Approval Order, the Sellers shall use commercially reasonable efforts to authorize the assumption and assignment or rejection of those licenses or other executory contracts identified by the Buyer at the Closing.

Section 6.4     Royalty Agreements. Following the Closing and the termination of the going-out-of business sales being conducted with respect to the retail stores operated by Linens 'n Things Canada Corp., Seller shall promptly take all necessary actions to terminate or reject the Canadian Agreements.

Section 6.5     Buyer's Working Capital Requirements; Priority Return of Harte-Hanks Payments. Following the Closing, the Joint Venture shall comply with its funding obligations under the Operating Agreement. The Operating Agreement shall provide that no distributions (other than tax distributions) shall be made to Seller until the Joint Venture shall have received distributions equal to the amount of the Harte-Hanks Payments reimbursed to Seller by Buyer pursuant to Section 6.9.

DALLAS 1995593v.14

Section 6.6    Management of Buyer.  In consideration of the Joint Venture's serving as the managing member of Buyer and conducting the ongoing business and operational matters of Buyer, including management of the day-to-day operations of Buyer, the Joint Venture shall earn from Buyer (i) a one-time transaction fee equal to $300,000 and payable at Closing, and (ii) an annual management fee equal to $350,000 per year.

Section 6.7    Bankruptcy Court Approval Order.

(a)    Seller shall use commercially reasonable efforts to obtain a final non-appealable order in the Bankruptcy Case approving of the transactions contemplated by this Agreement that has not been reversed, vacated, stayed, modified, or amended (the "*Approval Order*"), said Approval Order to be in form and substance satisfactory to Buyer and Seller, (a) approving the transactions described herein and authorizing Seller to sell, transfer and assign the Purchased Assets to Buyer pursuant to this Agreement, free and clear of all claims, interests and liabilities other than those expressly assumed by Buyer; (b) expressly providing that at Closing all of Seller's right, title and interest in the Purchased Assets shall vest in Buyer in accordance with this Agreement; (c) making a determination that Buyer is a good-faith purchaser and that sound business reasons exist for the transaction; (d) expressly providing that, pursuant to Bankruptcy Rule 3020(e), Section 363(m) of the Bankruptcy Code and other applicable authority, the Approval Order is not stayed for any period and that the reversal or modification on appeal of the Approval Order shall not affect the validity of the sale of the Purchased Assets to Buyer pursuant to this Agreement, whether or not Buyer knew of the pendency of the appeal, unless such authorization and sale are stayed pending appeal; (e) finding that adequate and proper notice was given to all parties entitled to receive notice in connection with the transactions contemplated by this Agreement, including, without limitation, appropriate notice to all parties to any executory contracts to be assumed and assigned to Buyer pursuant to this Agreement; and (f) finding that the transactions contemplated by this Agreement are in accordance with and do not violate Section 363(b)(1) of the Bankruptcy Code.

(b)    If a written objection is filed to the entry of the Approval Order, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Seller shall use commercially reasonable efforts to have such objection overruled.

Section 6.8    Bidding Procedures; Break-up Fee.  Following the execution of this Agreement by the Parties, Seller shall be entitled to solicit and accept other bids to acquire the Purchased Assets, provided that such bids provide cash to Seller in an amount equal to or greater than $2,500,000 (an "*Overbid Transaction*").  If an Overbid Transaction is approved by the Bankruptcy Court and consummated, the Joint Venture shall receive from the proceeds of such transaction a break fee equal to (i) $170,000 plus (ii) actual out-of-pocket fees and expenses, including legal fees, not to exceed $100,000.  Seller shall use commercially reasonable efforts to obtain the entry of a Bidding Procedures Order that approves the terms of this Section on or before December 31, 2008.

14

Section 6.9    Customer Lists.    Seller will take all commercially reasonable and necessary steps to ensure that the customer lists and related contact information can be properly transferred to Buyer, including, but not limited to, the retention of a consumer ombudsman, if necessary, and the entry of the Approval Order directing the transfer of the customer lists to the Buyer. Seller shall make necessary payments to Harte-Hanks for the purpose of retrieving and properly transferring customer-related information controlled by Harte-Hanks on behalf of Seller pursuant to the Harte-Hanks Agreement (the *"Harte-Hanks Payments"*), provided that such payments are authorized by the Bankruptcy Court.   At Closing, Seller shall be reimbursed by Buyer for the Harte-Hanks Payments made by Seller; provided, however, Harte-Hanks Payments shall be reimbursed by Buyer at Closing only if Buyer has approved such payments. Until the receipt of the customer lists and related contact information, Buyer will be deemed to be Seller's agent and shall have the same access to the Seller's customer lists and related contact information that the GOB Agent has under its agreement with the Seller, without any additional charge or expense to Buyer.

Section 6.10    Expenses.    Except as otherwise provided in this Agreement, each Party shall bear all of its own expenses incurred in connection with this Agreement and the transactions contemplated thereby, including legal, accounting, and investment advisor fees and travel expenses.

Section 6.11    Access to Information.    Seller agrees that, prior to the Closing Date, the Buyer shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.   Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.   Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business.   Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller is bound.

Section 6.13    Conduct of the Business Pending the Closing.    Prior to the Closing, except (a) as set forth this Section, (b) as required by applicable Law, (c) as otherwise expressly contemplated by this Agreement, or (d) with the prior written consent of the Joint Venture (which consent shall not be unreasonably withheld or delayed), Seller shall refrain from entering into, modifying, or otherwise altering, any new or existing contracts related to the Purchased Assets.

## ARTICLE VII

## TERMINATION

15

Section 7.1    Grounds for Termination.    Notwithstanding any contrary provision contained in this Agreement (except as set forth in Section 7.2) this Agreement may be terminated and the transactions contemplated hereby may be abandoned by:

(a)    Written agreement of the Parties at any time before the Closing;

(b)    Either Party if a bid other than Buyer's bid is approved by the Bankruptcy Court and subsequently consummated;

(c)    Either Party if (i) if the Approval Order has not been entered by January 19, 2009 (the "*Termination Date*"), or (ii) if any law or regulation makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited or consummating the transactions contemplated hereby would violate any non-appealable final order, decrees or judgment of any court or governmental authority having competent jurisdiction;

(d)    Either Party if an order is not entered by the Bankruptcy Court approving the Bid Procedures (including the break fee and bid protections set forth in Section 6.8) on or before January 15, 2009;

(e)    Either Party, if the Closing shall not have occurred by January 19, 2009; or

(f)    Either Party, if there shall be a breach by the other party of any of its representations or warranties, or any of its covenants or agreements contained in this Agreement, which breach cannot be cured or has not been cured by the earlier of (i) 5 business days after written notice is delivered to the breaching party by the non-breaching party indicating that a breach has occurred and a description of such breach and (ii) the Termination Date.

Section 7.2    Effects of Termination.

(a)    If this Agreement is terminated under Section 7.1, the Party terminating will promptly provide written notice thereof to the other Parties and this Agreement will thereafter become void and have no further force and effect, and, except for those provisions that expressly survive the termination of this Agreement, all further obligations of the Parties to each other under this Agreement will terminate without further obligations or liability. Notwithstanding anything contrary in this Agreement, Section 6.8 hereof shall survive a termination of this Agreement by Seller pursuant to Section 7.1(b).

(b)    Nothing in this Section shall relieve Seller or Buyer of any liability for a breach of this Agreement prior to the date of termination.

# ARTICLE VIII

## MISCELLANEOUS

16

Section 8.1  Further Assurances. Each Party agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein, contemplated hereby or reasonably requested by another Party to perfect or evidence the Party's rights hereunder. Such assurances shall include Seller's obligation to execute and deliver any instruments, powers of attorney, conveyances, assignments, or other documents relating to the transfer of the domestic and/or foreign Purchased Assets as may be reasonably requested by Buyer. In addition, subject to any express provisions of this Agreement to the contrary, Seller shall use its commercially reasonable efforts to cause any agent or affiliate (excluding the indirect Canadian subsidiaries of Linens Holding Co.) to transfer the Purchased Assets to Buyer in the event that such asset is owned by any such affiliate of Seller or is being held or maintained by an agent of Seller.

Section 8.2  Notices. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be sent by facsimile, personally delivered, or sent by overnight commercial delivery service (provided a receipt is available and requested with respect to such delivery), or mailed by first-class registered or certified mail, return-receipt requested, postage-prepaid, and shall be effective when received, if delivered by personal delivery, by facsimile, or by overnight delivery service, or, if mailed, said notice shall be effective on day received by the party to whom notice is mailed, as evidenced by the return receipt. Notices shall be provided to the Parties as indicated below:

If to Seller:

Linens Holding Co.
c/o Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Attention: Ronald M. Gaswirth, Esq.
Facsimile No.: (214) 999-3601

If to a Buyer Party:

Hilco Consumer Capital, LLC
5 Revere Drive
Northbrook, IL 60062
Attn: Eric Kaup
Tel. 847.849.2966
Fax: 847.897.0766

-and-

Gordon Brothers Group
101 Huntington Avenue - 10th Floor
Boston, MA 02199
Attn: Rafael Klotz, Esq.
Tel: 617-422-6246

17

Fax: 617-422-6288

With a copy to:

Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, New York 10036
Attn: Cathy Hershcopf, Esq.
Tel: 212-479-6138
Fax: 212-937-2041

or to such other person or address as any party hereto shall furnish to the other party hereto in writing pursuant to this Section 8.2.

Section 8.3     Entire Agreement; Amendment; Waiver.     This Agreement and the Approval Order referred to herein constitutes the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the Parties. No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision condition or rights granted thereunder.

Section 8.4     Assignment.     Neither this Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by any Party without the express prior written consent of the other Parties. This Agreement and the rights and obligations set forth herein shall inure to the benefit of, and be binding on, the Parties and each of their respective successors and permitted assigns.

Section 8.5     Joint Venture; Third-Party Beneficiaries.     Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties with respect to the subject matter hereof. The Parties do not intend that any third party shall have any rights under this Agreement.

Section 8.6     Representation by Counsel.     Each Party acknowledges that it has been represented by independent legal counsel of its choosing throughout all of the negotiations which preceded the execution of this Agreement, and that it has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document; and, as a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

18

Section 8.7    Captions.    The Section headings contained in this Agreement are for convenience only, and shall not be considered or referred to in resolving questions of interpretation.

Section 8.8    Counterparts.    This Agreement may be executed and delivered (including by facsimile or email transmittal, which for purposes of this Agreement shall be deemed to be an original signature) in one or more counterparts, and all such counterparts taken together shall constitute a single original Agreement.

Section 8.9    Governing Law.    This Agreement shall be governed by the laws of the state of Delaware as to, including, but not limited to, matters of validity, construction, effect and performance but exclusive of its conflicts of laws provisions.

Section 8.11    Jurisdiction.    Each Party acknowledges the jurisdiction of the Bankruptcy Court, and consents to the jurisdiction of the courts of the state of Delaware, or, as applicable, if it can acquire jurisdiction, the United States District Court for the District of Delaware as to claims arising under or brought in connection with this Agreement and the transactions contemplated herein.

*[Signature Pages Follow]*

19

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the day and year first above written.

SELLER:

LINENS HOLDING CO.

On Behalf of Itself and its Affiliated Debtors and Debtors-in-Possession

By: _____

Name: _FORREST A. COOER_

Title: _PRESIDENT & C.O.O._

BUYER PARTIES:

LNT ACQUISITION, LLC

By: _____

Name: _R.A.KASSAMALI_

Title: _MD OF HCC, A MANAGING MEMBER_

HILCO CONSUMER CAPITAL, LLC

By: _____

Name: _R.A. KASSAMALI_

Title: _MANAGING DIRECTOR_

GORDON BROTHERS BRANDS, LLC

By: _____

Name: _Rafael Klotz_

Title: _Managing Director_

## SCHEDULE 2.1(a)

[see attached]

## SCHEDULE 2.2

"Vendor Agreements" between vendors of Seller and LNT Merchandising Company, LLC or other Seller affiliate, generally on Seller's standard form, which may include a limited, non-exclusive license of any of Seller's intellectual property and/or a limited non-exclusive license of any of such vendor's intellectual property in connection with the sale of merchandise by vendor to Seller.

Agency Agreement made as of October 15, 2008, by and between Seller and a joint venture comprised of Gordon Brother Retail Partners, LLC, Hilco Merchant Resources, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC, Hudson Capital Partners, LLC and Great American Group, LLC

Agency Agreement made as of May 29, 2008, by and between Seller and a joint venture comprised of SB Capital Group, LLC and Tiger Capital Group, LLC

Agency Agreement made as of October 2008, by and between Linens 'n Things Canada Corp. and a joint venture comprised of GBRP Inc., HMR Canada II, Inc., Schottenstein Bernstein Corporation, Tiger Capital Group, LLC, Hudson Capital Partners, LLC and Great American Group CS, LLC

Limited licenses of intellectual property in connection with the settlement of various intellectual property disputes, a schedule of which shall be provided by Seller prior to Closing.

DALLAS 1995593v.14

## SCHEDULE 3.4

Court of Versailles, Inc. ("*COV*") has disputed Seller's right to use the Luxe Versailles trademark relating to bedding products. On March 13, 2007, Seller notified COV that Seller denied COV's allegations. COV has not responded to Seller's denial or otherwise pursued the matter with Seller.

In June 2008, Pem-America, Inc. sent a demand letter to LNT alleging infringement of two striped fabric designs, Moroccan Spice, Copyright Reg. No. VA 1-635-285, and Spa Pastel, Copyright Reg. No. VA 1-635-284. LNT investigated the claim and determined that it created the fabric designs in question prior to Pem-America. LNT sent two demand letters to Pem-America requesting damages for infringement. The matter was not resolved, so Pem-America is the record title owner of the fabric designs and the fabric designs are not included in the Purchased Assets.

Seller discovered recently that its e-commerce operator, GSI Commerce Solutions, Inc. registered the domain name www.linensnthings.org without authorization in July 2008. On December 18, 2008, Seller sent a demand letter to GSI requiring transfer of the domain name to Seller.

## EXHIBIT A

## TRADEMARK ASSIGNMENT

WHEREAS, LNT Merchandising Company, LLC ("Assignor"), a Delaware limited liability company, having a principal place of business at 6 Brighton Road, Clifton, New Jersey, 07012, has adopted, used, and/or intends to use, and is the owner of the trademarks and corresponding trademark applications and registrations listed on **Schedule A** attached hereto (collectively, the "Trademarks");

WHEREAS, LNT Acquisition, LLC ("Assignee"), a Delaware corporation, with a principal place of business at _____, is desirous of acquiring said Trademarks and all goodwill associated therewith, together with that portion of the Assignor's ongoing and existing business to which the Trademarks pertain;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby assign unto Assignee all right, title and interest in and to the Trademarks and all goodwill associated with (i) the Trademarks and (ii) that portion of the ongoing and existing business to which the Trademarks pertain, in connection with which the Assignor has a bona fide intent to use the Trademarks, and the right to sue and collect damages for past infringement of the Trademarks, the same to be held and enjoyed by the Assignee, its successors, or other legal representatives.

AND ASSIGNOR FURTHER COVENANTS AND AGREES that it will, at any time, upon request, execute and deliver any and all papers that may be necessary or desirable to perfect the title of said Trademarks in Assignee, it successors, assigns, or other legal representatives,

without further compensation but at the expense of Assignee, its successors, or other legal representatives.

EXECUTED THIS _____ day of _____, 2008.

LNT MERCHANDISING COMPANY, LLC

By: _____

Printed Name: _____

Title: _____

STATE OF _____     §

§

COUNTY OF _____ §

BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of LNT Merchandising Company, LLC, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me as an authorized representative of LNT Merchandising Company, LLC, that he/she executed the same as a free act on behalf of said company.

GIVEN UNDER MY HAND and seal of office this _____ day of _____, 2009.

_____

[Seal]                                    NOTARY PUBLIC IN AND FOR

THE STATE OF _____

## SCHEDULE A

| Trademark | Filing Date | Application Serial No. | Registration Date | Registration No. |
|---|---|---|---|---|
| AFFORDABLE LUXURY | 02/02/06 | 78/805,616 (Abandoned) | N/A | N/A |
| ANTHOLOGY | 10/29/07 | 76/683,382 | -- | -- |
| ATTITUDE | 06/01/04 | 78/427,854 | 08/05/08 | 3,482,045 |
| ATTITUDES | 06/01/04 | 78/427,863 | -- | -- |
| CLASSIC HOME DINING (common law) | -- | -- | -- | -- |
| COASTAL LIVING (common law) | -- | -- | -- | -- |
| COOK AT HOME (Design) | 06/20/2005 | 78/654,137 | 07/18/06 | 3,116,812 |
| DAMASK (common law) | -- | -- | -- | -- |
| DIAMOND SATEEN (common law) | -- | -- | -- | -- |
| DREAM BIG. PAY LITTLE. | 10/08/04 | 78/497,112 | 12/27/05 | 3,035,124 |
| ECO (common law) | -- | -- | -- | -- |
| E FORCE | 02/12/02 | 76/374,463 (Abandoned) | N/A | N/A |
| EVERYDAY BASICS | 08/28/06 | 76/665,186 | 06/19/07 | 3,252,734 |
| EVERYDAY BASICS (Design) | 08/28/06 | 76/665,182 | 07/08/08 | 3,459,942 |
| GENESIS & Design | 05/29/07 | 76/677,582 | -- | -- |
| GENESIS COTTON | 06/29/07 | 76/678,937 | -- | -- |
| GOURMET BUFFET | 06/14/06 | 78/907,679 | 12/11/07 | 3,354,298 |
| GOURMET BUFFET | 06/14/06 | 78/907,681 | 04/29/08 | 3,420,593 |

DALLAS 1995593v.14

| Trademark | Filing Date | Application Serial No. | Registration Date | Registration No. |
|---|---|---|---|---|
| SPA<br>(common law) | -- | -- | -- | -- |
| SPA-TEX | 03/23/04 | 78/389,104 | 10/24/06 | 3,163,479 |
| SUPER SET | 10/26/06 | 76/668,073 | -- | -- |
| SUPER SET | 11/28/06 | 76/669,608 | -- | -- |
| THAT'S A GREAT IDEA | 01/28/02 | 76/364,841<br>(Abandoned) | N/A | N/A |
| TROUSSEAU<br>(common law) | -- | -- | -- | -- |
| URBAN LIVING | 09/01/06 | 76/665,534 | N/A | N/A |
| WE BEAT WHITE SALES EVERYDAY | 06/06/90 | 74/066.247<br>(Abandoned) | 11/12/91 | 1,664,509<br>(Abandoned) |

SCHEDULE A - 5

| Trademark | Filing Date | Application Serial No. | Registration Date | Registration No. |
|---|---|---|---|---|
| HARVEST *(common law)* | -- | -- | -- | -- |
| HOTEL LIVING | 06/21/04 | 78/438,409 | 04/04/06 | 3,077,667 |
| HOUSE OF THE MILLENNIUM | 06/03/03 | 75/569,603 (Abandoned) | N/A | N/A |
| IDEAL KITCHEN *(common law)* | -- | -- | -- | -- |
| IN BLOOM *(common law)* | -- | -- | -- | -- |
| LINENS 'N THINGS | 09/09/70 | 72/370,206 | 05/16/72 | 934,171 |
| LINENS-N-THINGS (Design) | 05/26/04 | 78/425,295 | 03/07/06 | 3,065,133 |
| LNT | 09/01/98 | 75/546,927 | 04/04/00 | 2,337,611 |
| LNT HOME *(common law)* | -- | -- | -- | -- |
| LNT RESTAURANT *(common law)* | -- | -- | -- | -- |
| LUXE VERSAILLES | 03/29/06 | 78/849,442 | 10/07/08 | 3,512,570 |
| MAKE YOUR HOME HAPPY | 06/03/03 | 78/257,756 (Abandoned) | N/A | N/A |
| MAGIC COMFORT | 05/05/06 | 76/659,622 | 09/23/08 | 3,505,724 |
| NEW ATTITUDE | 12/04/06 | 76/669,884 | 01/08/08 | 3,364,113 |
| PORTFOLIO | 09/22/06 | 76/666,441 (Abandoned) | N/A | N/A |
| PURE GREEN | 11/07/07 | 76/683,760 | -- | -- |
| ROOM CONCEPTS *(common law)* | -- | -- | -- | -- |
| SIGNATURE HOME DÉCOR | 10/26/06 | 76/668,072 (Abandoned) | N/A | N/A |
| SIMPLE SOLUTIONS | 04/02/07 | 76/584,833 | 01/31/06 | 3,056,000 |
| SIMPLE SOLUTIONS | 5/23/06 | 76/660,456 (Abandoned) | N/A | N/A |

SCHEDULE A - 4

## EXHIBIT B

## ASSIGNMENT OF TRADE MARK RIGHTS – MORE THAN ONE MARK

The undersigned, **LNT Merchandising Company, LLC** (the "Assignor"), having a principal place of business at 6 Brighton Road, Clifton, New Jersey 07012, USA, in consideration of Five Dollars ($5.00) and other good and valuable consideration paid to it, the receipt and adequacy of which is hereby confirmed, hereby sells, assigns and transfers to **LNT Acquisition, LLC** (the "Assignee"), having a principal place of business at _____, all of Assignor's right, interest and title in and to the following:

a)   the trade marks shown on Schedule B attached hereto (hereinafter called the "Trade Marks");

b)   Canadian trade mark registration numbers/ application serial numbers for the Trade Marks;

c)   all of the goodwill which Assignor has in and to the Trade Marks;

d)   the right to oppose and/or continue any opposition to the registration of any other trade mark based on the Trade Marks; and

e)   the right to commence and/or continue any action for past infringement of any rights in the Trade Marks and to collect damages or profits as a result of such infringement.

**EXECUTED**   at   _____,   this   _____   day   of _____, 2009.

SCHEDULE A - 1

**LNT Merchandising Company, LLC**

Printed Name: _____

Title: _____

## SCHEDULE B

| No. | Trade Mark | Serial No. | Fling Date | Reg. No. | Reg. Date |
|-----|-----------|-----------|-----------|----------|-----------|
| 1. | ANTHOLOGY | 1387416 | 14-Mar-2008 | | |
| 2. | ATTITUDE | 1237174 | 15-Nov-2004 | | |
| 3. | ATTITUDES | 1237170 | 15-Nov-2004 | | |
| 4. | EVERYDAY BASICS | 1324688 | 17-Nov-2006 | TMA719420 | 25-Jul-2008 |
| 5. | EVERYDAY BASICS & DESIGN | 1324689 | 17-Nov-2006 | | |
| 6. | GENESIS & DESIGN | 1366303 | 04-Oct-2007 | | |
| 7. | LINENS 'N THINGS | 0885316 | 22-July-1998 | TMA548162 | 31-July-2001 |
| 8. | LNT | 1137576 | 16-April-2002 | TMA596581 | 4-Dec-2003 |
| 9. | LUXE VERSAILLES | 1317929 | 26-Sep-2006 | | |
| 10. | MAGIC COMFORT | 1322766 | 02-Nov-2006 | | |
| 11. | NEW ATTITUDE | 1349830 | 01-Jun-2007 | | |
| 12. | PURE GREEN | 1391215 | 14-Apr-2008 | | |
| 13. | SIMPLE SOLUTIONS | 1400397 | 19-Jun-2008 | | |
| 14. | SIMPLE SOLUTIONS | 1324185 | 15-Nov-2006 | | |
| 15. | SPA-TEX | 1324678 | 17-Nov-2006 | TMA706381 | 01-Feb-2008 |
| 16. | SUPER SET | 1338050 | 06-Mar-2007 | | |
| 17. | URBAN LIVING | 1327024 | 06-Dec-2006 | | |

DALLAS 1995593v.14

## EXHIBIT C

### COPYRIGHT ASSIGNMENT

LNT Merchandising Company, LLC, a Delaware limited liability company, having a principal place of business at 6 Brighton Road, Clifton, New Jersey, 07012 ("ASSIGNOR"), in consideration of Ten and No/100 Dollars (US $10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby:

SELLS, ASSIGNS, and TRANSFERS to LNT Acquisition, LLC, a Delaware limited liability company, having a principal place of business at _____ ("ASSIGNEE"), its entire right, title, and interest in and to the copyrights, including without limitation all renewals and extensions of the copyrights, and other intellectual property rights, if any, and the right to use and recover damages for past infringement of copyrights and other intellectual property rights, for the United States and all foreign countries, in and to the fabric design entitled "Moon & Stars", and covered by U.S. Copyright Registration VA-1-056-560.

ASSIGNOR hereby covenants and agrees that it will, at any time, upon request, execute and deliver any and all papers that may be necessary or desirable to perfect the transfer of rights described herein, without further compensation, but at the expense of said ASSIGNEE, its successors or other legal representatives.

EXHIBIT C - 1

DALLAS 1995593v.14

LNT MERCHANDISING COMPANY,
LLC

By: _____

Printed Name: _____

Title:_____

Date: _____

STATE OF _____     §

                      §

COUNTY OF _____     §

      BEFORE ME, the undersigned authority, on this day personally appeared _____, _____ of LNT Merchandising Company, LLC, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me as an authorized representative of LNT Merchandising Company, LLC that he/she executed the same as a free act on behalf of said company.

      GIVEN under my hand and seal of office this ___ day of _____, 2009.

[SEAL]

                 _____

                 NOTARY PUBLIC IN AND FOR THE STATE

                 OF _____

EXHIBIT C - 2

## EXHIBIT D

### ASSIGNMENT

WHEREAS, Theresa Ulczak, a citizen of the United States, and residing at the address stated below ("Ulczak"), has made a design invention entitled "SUPER SET BEACH SET COOLER" while in the employ of and as a work for hire for LNT Merchandising Company, LLC ("LNT") (collectively LNT and Ulczak are referred to as "ASSIGNORS");

WHEREAS, LNT Acquisition, LLC, a Delaware limited liability company, having a principal place of business at _____ ("ASSIGNEE"), is desirous of acquiring the same;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, ASSIGNORS do hereby assign, sell, transfer and set over unto said ASSIGNEE the entire right, title and interest in and to (a) said invention and worldwide rights therein; (b) any design and/or utility patent application, including all divisions, continuations and substitutions thereof; (c) all United States and foreign patents which shall issue on said invention, including all reissues, renewals and extensions thereof, for the United States, its territories and possessions and all foreign countries, including the right to file corresponding applications for Letters Patent on said invention in any and all foreign countries, and to claim priority under any and all treaties and conventions to which the United States of America is signatory including the Paris Convention for the Protection of Industrial Property for such corresponding applications, or any division, continuation or substitution thereof, and (d) the copyrights, including without limitation all

renewals and extensions of the copyrights and other intellectual property rights, the same to be held and enjoyed by said ASSIGNEE, its assigns and successors.

ASSIGNORS FURTHER COVENANT AND AGREE that they will, at any time upon the request and at the expense of said ASSIGNEE, execute and deliver any and all papers and do all lawful acts that may be necessary or desirable, in the opinion of said ASSIGNEE, to enable and assist said ASSIGNEE to (a) obtain Letters Patent, both domestic and foreign, on said invention; (b) obtain copyright registrations, (c) establish, maintain and secure title in said ASSIGNEE, its successors and assigns, to said copyrights, invention, application and Letters Patent, including making such title of lawful public record; and (c) defend, establish or otherwise preserve the validity of said Letters Patent and copyrights against any and all infringers, and perform such other acts as are necessary to give full force and effect to this assignment.

ASSIGNORS hereby authorize and request the Commissioner for Patents of the United States to issue all Letters Patent based on said application and each division, continuation, substitution, reissue, renewal and extension thereof to said ASSIGNEE, its successors and assigns.

EXECUTED this _____ day of _____, 2009.

_____

THERESA ULCZAK

Address: _____ _____

_____

EXHIBIT D - 2

LNT MERCHANDISING COMPANY, LLC

By: _____

Printed name: _____

Title: _____

STATE OF _____ §

§

COUNTY OF _____ §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Theresa Ulczak, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND and seal of office this _____ day of _____, 2009.

_____

Notary Public

My commission expires: _____

_____

STATE OF _____ §

§

COUNTY OF _____ §

BEFORE ME, the undersigned Notary Public, on this day personally appeared _____, _____, of LNT Merchandising Company, LLC, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me as an

EXHIBIT D - 3

authorized representative of LNT Merchandising Company, LLC that he/she executed the same as a free act on behalf of the company.

GIVEN UNDER MY HAND and seal of office this _____ day of _____, 2009.

_____

Notary Public

My commission expires: _____

## FIRST AMENDMENT

## TO

## INTELLECTUAL PROPERTY PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO INTELLECTUAL PROPERTY PURCHASE AGREEMENT (this "*Amendment*") is entered into effective as of January 14, 2009 by and among Linens Holding Co., a Delaware corporation, and its affiliated debtors and debtors-in-possession (collectively, "*Seller*"), LNT Acquisition, LLC, a Delaware limited liability company ("*Buyer*"), and a joint venture (the "*Joint Venture*") comprised of Hilco Consumer Capital, L.P., a Delaware limited partnership, and Gordon Brothers Brands, LLC, a Delaware limited liability company. Buyer and the Joint Venture are referred to herein collectively as "*Buyer Parties*." Buyer, Seller and the Joint Venture are also referred to herein individually as a "*Party*" and collectively as the "*Parties*."

WHEREAS, the Parties have entered into that certain Intellectual Property Purchase Agreement effective as of December 22, 2008 (the "*Purchase Agreement*"), pursuant to which Buyer has agreed to purchase certain intellectual property assets of Seller;

WHEREAS, the Parties wish to amend certain terms of the Purchase Agreement as described herein; and

WHEREAS, Capitalized terms used herein without definition have the respective meanings given such terms in the Purchase Agreement;

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

Section 1. <u>Amendment</u>. Article VI of the Purchase Agreement is hereby amended by adding the following new Sections 6.14 and 6.15 to such Article VI:

Section 6.14. <u>LNT.com Email Addresses</u>. From and after the Closing and until March 1, 2009, at Seller's expense, Seller shall be entitled to continue to use the LNT.com email addresses used by its employees and representatives prior to the Closing. Information transmitted to and from such email addresses shall remain the property of Seller.

Section 6.15 <u>Confidentiality</u>. Until the Closing, each Buyer Party agrees to treat confidentially and not to disclose to any Person (other than an affiliate, employee, representative or agent of such Buyer Party who (i) needs to know such information for the purpose of evaluating the transactions contemplated hereby and (ii) agrees to maintain the confidentiality of such Confidential Information) any confidential information, knowledge or data concerning the business affairs, operations, secrets, dealings or finances of Seller (collectively, "*Confidential Information*") and not to use such Confidential Information in any manner except in connection with the transactions contemplated hereby. As used in this <u>Section 6.15</u>, the term Confidential Information shall not include information which (i)

becomes generally available to the public other than as a result of disclosure by the Buyer Parties and their respective affiliates, employees, representatives or agents, (ii) was available to the Buyer Parties on a non-confidential basis prior to its disclosure, or (iii) becomes available on a non-confidential basis from a third party source entitled to disclose such information to the Buyer Parties. In the event this Agreement shall be terminated and the transactions contemplated hereby abandoned as provided in Article VII hereof, upon request of Seller at any time, Buyer Parties will return to Seller all Confidential Information in written form furnished by Seller, and destroy all copies thereof made by Buyer Parties and their respective affiliates, employees, representatives or agents. Notwithstanding the foregoing, the Parties shall make such disclosures of Confidential Information as may be necessary to obtain all necessary consents and approvals of Governmental Bodies for the transaction contemplated herein.

Section 2. Full Force and Effect. Except as amended hereby, the Purchase Agreement shall remain in full force and effect. All provisions of the Purchase Agreement, as amended hereby, shall apply to this Amendment as if they were set forth in full herein.

Section 3. Counterparts. This Amendment may be executed and delivered (including by facsimile or email transmittal, which for purposes of this Amendment shall be deemed to be an original signature) in one or more counterparts, and all such counterparts taken together shall constitute a single original Amendment.

*[Signature Pages Follow]*

2

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the day and year first above written.

**SELLER:**

LINENS HOLDING CO.

On Behalf of Itself and its Affiliated Debtors and Debtors-in-Possession

By: _____

Name: _FORREST D. COOER_

Title: _PRESIDENT & CHIEF OPERATING OFFICER_

**BUYER PARTIES:**

LNT ACQUISITION, LLC

By: _____

Name: _____

Title: _____


HILCO CONSUMER CAPITAL, LLC

By: _____

Name: _____

Title: _____


GORDON BROTHERS BRANDS, LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the day and year first above written.

SELLER:

LINENS HOLDING CO.

On Behalf of Itself and Its Affiliated Debtors and Debtors-in-Possession

By: _____

Name: _____

Title: _____


BUYER PARTIES:

LNT ACQUISITION, LLC

By: _____

Name: _R.A. KASSAMALI_____

Title: _MD of HCC, A MANAGING MEMBER_

HILCO CONSUMER CAPITAL, LLC

By: _____

Name: _R.A. KASSAMALI_____

Title: _MANAGING DIRECTOR_____

GORDON BROTHERS BRANDS, LLC

By: _____

Name: _Rafael Klotz_____

Title: _Managing Director_____